IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KALEB D. ROSS,

                        Petitioner,

v.                                              OPINION and ORDER

CHRIS BUESGEN,[1]                                            23-cv-357-jdp

                        Respondent.

---

Petitioner Kaleb D. Ross seeks relief under 28 U.S.C. § 2254 following his convictions for sexual assault, criminal damage to property, and disorderly conduct in Marathon County Case No. 2011CF000505. Ross alleges a claim of actual innocence and a claim of ineffective assistance of counsel. Rule 4 of the Rules Governing § 2254 Cases requires me to examine the petition and supporting exhibits and dismiss the petition if it "plainly appears" that Ross is not entitled to relief. Ross's claim of actual innocence is not, by itself, an independent ground for relief cognizable under § 2254. His claim of ineffective assistance is procedurally defaulted and, ultimately, plainly insufficient. I will deny the petition.

BACKGROUND

This background is largely drawn from the state court of appeals' decision affirming the circuit court's decision denying Ross's postconviction motion to withdraw his plea based on newly discovered evidence. *State v. Ross*, 2022 WI App 55. In reviewing Ross's petition under Rule 4, I take judicial notice of the records in Ross's underlying state court proceedings,

---

[1] I substituted Buesgen as respondent because he is the warden of Stanley Correctional Institution, where Ross is incarcerated. *See* Rule 2(a), Rules Governing § 2254 Cases.

including online docket sheets in 2011CF000505, 2014AP002509, and 2020AP001818. *See Green v. Warden*, 699 F.2d 364, 369 (7th Cir. 1983); *Sample v. Marske*, No. 21-cv-445-wmc, 2021 WL 5356447, at *1 (W.D. Wis. Nov. 17, 2021).

The state charged Ross with: two counts of sexual assault of a child under sixteen; one count of attempted sexual assault of a child under sixteen; one count of false imprisonment; two counts of disorderly conduct; one count of misdemeanor theft; and one count of being party to the crime of criminal damage to property. *Id.* ¶ 2. The charges arose from similar allegations made by two 14-year-old girls, whom the state court of appeals pseudonymously called "Karen" and "Sarah." *Id.*

Karen and Sarah alleged that they met Ross, his brother Kyle Ross, and Dustin Widder in a parking lot late at night to retrieve a shirt belonging to Karen that Ross had. *Id.* ¶ 3. The girls alleged that Ross forcibly kissed and groped Karen and tried to remove her clothing and make her touch Ross's penis, while Widder grabbed Sarah's hips and forcibly sucked on her neck. *Id.* The girls broke free and ran away, and the three males chased them to an apartment where Sarah lived with her family. *Id.* Karen entered the apartment first, leaving Sarah alone with the three males in the hallway. *Id.* Ross then groped Sarah's "crotch and boobs in the hallway while she tried to push him away and told the three males to leave." *Id.* (alteration adopted). After Sarah managed to enter the apartment and lock the door, someone kicked the door until it cracked and knocked over a microwave stored in the hallway. *Id.* "The three males then fled." *Id.*

Karen and Sarah's allegations were partially corroborated by: police documentation of the damage to the door; the statement of Sarah's sister that, when Karen opened the door to let Sarah in, the sister saw Sarah telling Ross to "stop" and pushing him away; the observations

2

of the police that both girls were crying shortly following the incident; Widder's statement to police that "something did happen" but that Widder was "not gonna snitch on anybody, no matter what"; and Ross's own statements to the presentence investigation report author that he, Kyle Ross, and Wider had met the girls in the parking lot to exchange shirts before "hanging out" in the hallway outside Sarah's apartment and that Widder "was being dumb and kicked the door as they were leaving and they ran out of the building." *Id.* ¶ 4 (alteration adopted).

Pursuant to a plea agreement, Ross pleaded no contest to the sexual assault count involving Sarah and to being party to the crime of criminal damage to property, and guilty to the disorderly conduct counts. *Id.* ¶ 5. In exchange, the state agreed to defer entry of judgment on the sexual assault count involving Sarah, and to recommend that the circuit court dismiss the theft count, and to dismiss and read in the other counts. *Id.* The deferred entry of judgment agreement was later revoked because Ross committed additional crimes, and the circuit court imposed and stayed a sentence consisting of eight years' initial confinement followed by five years' extended supervision on the sexual assault count, and it placed Ross on probation for five years. *See id.*; *State v. Ross*, No. 2014AP2509-CRNM, 2015 WL 13122403, at *2 (Wis. Ct. App. Apr. 14, 2015).

The circuit court entered Ross's judgment of conviction on December 16, 2013, and an amended judgment of conviction on January 1, 2014. Ross filed a postconviction motion to withdraw his pleas on September 23, 2014, which the circuit court denied without a hearing. *See Ross*, 2015 WL 13122403, at *2. The circuit court denied this motion on about October 1, 2014. Ross appealed; his counsel filed a no-merit report contending that there was no "arguable basis for Ross to appeal judgments of conviction and a postconviction order denying Ross's motion to withdraw his guilty and no-contest pleas." *Id.* at *1. On April 14, 2015, the state

court of appeals summarily affirmed, concluding that there was no arguable basis for appeal. *See id.* Ross did not seek reconsideration of the court of appeals' decision or seek review in the state supreme court. *See* Dkt. 1 at 10.

On April 15, 2016, "Karen went to the Wausau Police Department and recanted her statement." *See Ross*, 2022 WI App 55, ¶ 6; Dkt. 1 at 5. On November 30, 2016, Ross filed a postconviction motion to withdraw his plea based on Karen's recantation. *See Ross*, 2022 WI App 55, ¶ 6.

At a hearing on Ross's motion, Karen testified that she and Sarah were in a parking lot with Ross, Kyle Ross, and Widder at about midnight on the night in question, but Karen denied having experienced or witnessed any type of "unwanted or assaultive contact" there. *Id.* ¶ 7. Karen denied that Ross had taken her shirt earlier in the day. *Id.* Karen testified that the group had gone from the parking lot to the hallway outside the apartment where Sarah was living, where Karen again saw "nothing of an assaultive nature occur." At some point after Karen entered the apartment while the others stayed in the hallway, "Karen heard Sarah yelling 'stop' through the closed door." *Id.* "Karen said the boys were persistent about coming inside to hang out, but they could not because Sarah's dad was sleeping." *Id.*

"Karen further testified that after both girls were in the apartment, the microwave being 'thrown down the stairs' made a loud noise that awoke Sarah's father." *Id.* ¶ 8. Allegedly, "Sarah's father was very upset about the microwave, and Sarah started crying and related a 'story' to her father about what [Widder] had done to [Sarah] in the parking lot." *Id.* Karen allegedly sat in a corner and cried while Sarah was talking to her father, and then "went along and lied to both Sarah's father and the police about [Ross] molesting her." *Id.* "Karen claimed that she created her own detailed lies about Ross beyond anything Sarah had alleged because

4

Sarah was her best friend and she did not want to make Sarah look like a fool or a liar." *Id.* Karen added that she did not recant earlier because she feared getting in trouble for lying, but finally came forward because her lies had been "haunting" her. *Id.*

The circuit court denied Ross's motion on about September 22, 2020. It reasoned that Karen's recantation "was not corroborated by a feasible motive for having made a prior false statement or by substantial guarantees of trustworthiness," and that the recantation was immaterial to the count involving Sarah, "which had occurred outside of Karen's sight." *Id.* ¶ 9.

Ross appealed and, on September 7, 2022, the state court of appeals affirmed, concluding that Ross failed to establish corroboration for the recantation. *See id.* ¶¶ 13–19. The state court of appeals reasoned that Karen's testimony that she falsely accused Ross of assaulting her to avoid making Sarah "look like a fool or a liar" was not "feasible" because Sarah alleged that Ross assaulted Sarah in the hallway. *See id.* ¶ 14. So Karen did not need to invent additional allegations against Ross about what happened in the parking lot to support Sarah's story or avoid accusing Sarah of lying. *See id.*

Ross argued that Karen was motivated to falsely accuse him because she was mad that he was ignoring her. *Id.* ¶ 15. The state court of appeals determined that this contention lacked evidentiary support "because Karen did not testify to that motivation and Kaleb did not introduce any sworn statement from Karen to that effect." *Id.*

Ross argued that text messages Karen sent Widder on the night of the incident revealed "inconsistencies in her original story and that she had 'rape' on her mind." *Id.* ¶ 16. The court concluded that the text messages did not inform the analysis because they were "referenced in the original complaint" and not newly discovered. *Id.*

5

The state court of appeals determined that the recantation "lacked internal consistency" because Karen's testimony did not explain: what the group had been doing together in the parking lot; when or why Karen entered Sarah's apartment so as to leave Sarah in the hallway with the boys; why Karen was standing on one side of the door listening to what was going on in the hallway; how the apartment door became cracked; or why any of the three males would throw the microwave down the stairs. *Id.* ¶ 17. The state court of appeals also determined that "Karen's assertion that she lied to protect Sarah because Sarah was her best friend was undermined by the fact that Karen and Sarah did not have any further contact with one another once Sarah moved away a few weeks after the assaults." *Id.* According to the state court of appeals, Karen's contentions that Sarah was crying merely because she was afraid of getting in trouble, and that Karen was crying because she was scared and confused, "ma[de] little sense." *Id.*

The state court of appeals determined that Karen's recantation was "inconsistent with other facts that supported [Karen's] prior statements." *Id.* ¶ 18. In support, the state court of appeals stated that "Karen's assertion that nothing 'assaultive' occurred in the hallway was directly contradicted by Sarah's statement that [Ross] assaulted her in the hallway and by the observation of Sarah's sister that Sarah was saying 'stop' and pushing [Ross] away when Karen opened the door to let in Sarah." *Id.* These inconsistencies were significant, the state court of appeals reasoned, because Sarah and her sister did not recant their statements in circuit court. *See id.* The state court of appeals further reasoned that Karen's denial that Ross took her shirt contradicted Ross's own statement that the group had met in the parking lot to trade shirts. *Id.*

6

On January 19, 2023, the state supreme court denied review. *State v. Ross*, 2023 WI 29. Ross filed his petition in this court on May 22, 2023.

Ross contends that he is actually innocent based on Karen's recantation, which he characterizes as newly discovered evidence. Dkt. 1 at 13. Ross also contends that trial and postconviction counsel provided ineffective assistance by not reviewing discovery that contained text messages that allegedly showed that Karen and Sarah falsely accused him of sexual assault. *See id.* at 15. Ross contends that, had trial counsel brought the text messages to his attention, he would not have pleaded guilty. *See id.* at 3–4, 7.

## ANALYSIS

Federal courts may grant habeas relief only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)–(2). A state court's adjudication is "contrary to" clearly established Supreme Court precedent if the court either: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, courts may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case. *Id.* at 413. For the application to be unreasonable, a state prisoner "must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 141 S. Ct. 517, 523

(2020) (per curiam). Similarly, for a state court's factual finding to be unreasonable, there must be no possibility of reasonable agreement with the finding. *See Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015); *Wood v. Allen*, 558 U.S. 290, 301–02 (2010).

When applying § 2254(d), courts look to "the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *See Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Review under § 2254(d) is limited to the state-court record. *See Shoop v. Twyford*, 142 S. Ct. 2037, 2043–44 (2022); *Dunn v. Neal*, 44 F.4th 696, 702 (7th Cir. 2022). The petitioner bears the burden to show an error under § 2254(d), and the burden of proof under § 2254 generally. *See Westray v. Brookhart*, 36 F.4th 737, 746 (7th Cir. 2022); *Quintana v. Chandler*, 723 F.3d 849, 854 (7th Cir. 2013).

## A. Actual innocence

The Supreme Court has not "resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence [in a non-capital case]." *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *see also Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021); *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018); *Perrone v. United States*, 889 F.3d 898, 903 (7th Cir. 2018). Because the Supreme Court has yet to hold that a prisoner may be entitled to habeas relief based on a standalone actual innocence claim in a non-capital case, Ross has not shown that the state court of appeals' rejection of this claim contradicted or unreasonably applied clearly established federal law. *See White v. Woodall*, 572 U.S. 415, 419 (2014) ("clearly established Federal law" under § 2254(d)(1) "includes only the holdings . . . of [the Supreme] Court's decisions"); *Hall v. Zenk*, 692 F.3d 793, 799 (7th Cir. 2012) ("In considering whether clearly established federal law exists with respect to a particular issue, we may only consider

the holdings of the U.S. Supreme Court . . . ."). I will not allow Ross to proceed on his actual innocence claim. But even if Ross could proceed on a meritorious freestanding actual innocence claim, I would deny this petition for reasons explained in the next section.

**B.  Ineffective assistance of counsel**

I cannot grant Ross's petition based on his claim of ineffective assistance unless he "has exhausted the remedies available in the courts of the State." *Wilson v. Cromwell*, No. 21-1402, 2023 WL 3766252, at *8 (7th Cir. June 1, 2023) (publication forthcoming). To fairly present this claim in state court, Ross must assert it "throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in postconviction proceedings." *See id.* This "complete round rule" means that Ross must raise his claim of ineffective assistance at each level of the Wisconsin court system, including any level at which review is discretionary instead of mandatory. *See id.*

If a habeas petitioner has failed to exhaust his federal claims and the opportunity to raise those claims in state court has passed, the petitioner has procedurally defaulted those claims for purposes of federal habeas review. *See Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004); *see also Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022) (federal habeas courts "generally decline to hear any federal claim that was not presented to the state courts consistent with the State's own procedural rules." (alteration adopted)). For procedural default to apply, the state procedural rule that would bar further consideration of the federal claim in state court must be "independent and adequate." *See Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991). The state procedural rule is independent "if it does not depend on the merits of the petitioner's claim." *See Flint v. Carr*, 10 F.4th 786, 793 (7th Cir. 2021). "State rules count as adequate if

they are firmly established and regularly followed." *Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016) (per curiam).

After conviction, Wisconsin defendants must bring claims of ineffective assistance in motions for postconviction relief under Wis. Stat. § 974.02, which they must file in the trial court. *See Page v. Frank*, 343 F.3d 901, 905–06 (7th Cir. 2003). If the trial court denies the motion, the defendant must "file[] a consolidated appeal of the judgment and the postconviction order" in the state court of appeals. *See Garcia v. Cromwell*, 28 F.4th 764, 766 (7th Cir. 2022); *see also Lee-Kendrick v. Eckstein*, 38 F.4th 581, 587 (7th Cir. 2022) ("[A] claim of ineffective assistance of counsel under [Wis. Stat.] § 974.02 is part of a direct appeal rather than a request for collateral review."); Wis. Stat. § 809.30(2). If the appeal is unsuccessful, defendants must present their federal claims to the state supreme court in petitions for review to exhaust them. *Wilson*, 2023 WL 3766252, at *8; *Johnson v. Foster*, 786 F.3d 501, 505 (7th Cir. 2015).

After the time for appeal or postconviction remedy provided in § 974.02 has expired, a petitioner generally may proceed under Wis. Stat. § 974.06. *See Garcia*, 28 F.4th at 772. Section 974.06 generally permits the circuit court to vacate a conviction or sentence imposed in violation of the Constitution. *See id.* A petitioner must seek review of the circuit court's denial of his § 974.06 motion in both the state court of appeals and the state supreme court. *See Thompson v. Carr*, No. 20-cv-280, 2020 WL 4569179, at *2 (E.D. Wis. Aug. 7, 2020); *Walton v. Foster*, No. 20-cv-216-bbc, 2020 WL 2218779, at *2 (W.D. Wis. May 7, 2020).

The state supreme court has interpreted § 974.06 "to exclude all issues that were or could have been raised in a § 974.02 postconviction motion or appeal, including constitutional issues, unless the defendant provides 'sufficient reason' for not raising the issues in that earlier

proceeding." *Page*, 343 F.3d at 906 (quoting *Escalona–Naranjo*, 185 Wis. 2d 168, 181 (1994)). "In an appropriate case, ineffective assistance of postconviction counsel may qualify as a sufficient reason to excuse a procedural default [for purposes of a § 974.06 motion]." *See Garcia*, 28 F.4th at 767 (citing *State v. Romero-Georgana*, 360 Wis. 2d 522, 542 (2014)). But this "gateway to merits review of a defaulted claim carries a heightened pleading burden" and would apply only if Ross provided "factual allegations showing that the defaulted claims were 'clearly stronger' than the issues postconviction counsel chose to present." *See id.* (quoting *Romero-Georgana*, 360 Wis. 2d at 545).

Claims of ineffective assistance of counsel are governed by the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish that counsel provided ineffective assistance, Ross must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. at 687. To prove deficient performance, Ross must show that counsel's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. To prove prejudice, Ross must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If a petitioner cannot show prejudice, the court need not address the performance prong. *See Chichakly v. United States*, 926 F.2d 624, 630 (7th Cir. 1991).

"During plea negotiations defendants are entitled to the effective assistance of competent counsel." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citation omitted). *Strickland* "applies to challenges to guilty pleas based on ineffective assistance of counsel." *Id.* at 162–63. Because Ross alleges that trial counsel's deficient performance "led to the improvident acceptance of a guilty plea," he must "show that there is a reasonable probability that, but for

11

counsel's errors," he "would not have pleaded guilty and would have insisted on going to trial." *Id.* at 163.

Ross concedes that he did not exhaust his claim of ineffective assistance. Ross contends that he is "barred" from raising this claim because he did not discover the text messages until after he appealed the circuit court's denial of his postconviction motion to withdraw his plea based on Karen's recantation. Dkt. 1 at 16.

The time for Ross to file a § 974.02 motion raising his claim of ineffective assistance has long expired. *Cf. Garcia*, 28 F.4th at 772. Ross could seek relief under § 974.06, contending that postconviction counsel provided ineffective assistance by failing to raise his claim that trial counsel provided ineffective assistance. Ross contends that the subject text messages were included in the state's discovery and that trial counsel could have discovered them before he pleaded guilty. If trial counsel had done this, Ross adds, he would have gone to trial.

But Ross has not provided factual allegations showing that the defaulted claim is "clearly stronger" than the issues postconviction counsel chose to present. Ross's allegations do not suggest that he would not have pleaded guilty had trial counsel brought the text messages to his attention. Ross alleges that text messages that Karen sent Widder before the incident show that: (1) Karen and Sarah wanted to meet Ross; they were not lured to the parking lot; (2) Karen and Sarah lied about Ross taking Karen's shirt; and (3) Karen texted "Hurry I swear to god I'm gonna get raped" 1.5 hours before the incident. *See* Dkt. 1 at 7.

Ross alleges that Karen's first text message shows that she and Sarah wanted to meet the boys, not that the girls were lured to the parking lot. But the complaint simply alleged that "Ross and two of his friends called the victims asking them to meet at a Pizza Hut so they could return the shirt." *Ross*, 2015 WL 13122403, at *1. Ross's allegations do not suggest that

12

Karen and Sarah accused him of "luring" them to the parking lot, much less that his plea turned on this accusation.

Karen allegedly stated in the second text message that she lied that Ross took her shirt. But Ross did not need this text message to know this, so it's unclear how knowledge of the text message would have affected his plea. Ross may be suggesting that he would have felt more confident about going to trial had he known that he could use this text message as evidence. But the state court of appeals found that Ross stated that the group had met in the parking lot to trade shirts, and Sarah did not recant her same statement. *Ross*, 2022 WI App 55, ¶ 18. Ross's allegations do not suggest that he would have gone to trial had he known about the second text message.

Ross alleges that Karen sent Widder a text message saying "Hurry I swear to god I'm gonna get raped" 1.5 hours before the incident. Ross has not explained the significance of this text message, *see* Dkt. 1 at 7, apart from the general allegation that he would have gone to trial had he known about it. This isolated statement is subject to interpretation. Perhaps Ross means that it shows that Karen planned to fabricate the sexual assault allegations. But Karen stated in her recantation that she accused Ross of sexual assault to protect Sarah, which occurred after the boys went to Sarah's apartment. In other words, Karen's recantation is inconsistent with the idea that she planned to falsely accuse Ross of sexual assault before the incident. Ross may mean that the third text message shows that Karen invited sexual contact from him. But Karen stated in her recantation that Ross had no sexual contact with her. In any case, Ross has not provided specific allegations warranting the inference that Karen invited sexual contact from him, much less that she consented to it. Also, Ross pleaded no contest to sexually assaulting

Sarah, not Karen, which further undermines the contention that Ross would have gone to trial had he known about Karen's third text message.

The state court of appeals accurately described Ross's plea agreement as "very generous." *Ross*, 2015 WL 13122403, at *3. "If Ross had complied with the terms of his probation and deferred judgment, the plea agreement would have reduced his prison exposure by more than 100 years, resulting in only an eight-month jail sentence with credit for 228 days." *Id.* at *2. The value of the plea offer weakens Ross's bare assertion that knowledge of the text messages would have caused him to go to trial.

Ross's allegations do not establish a reasonable probability that he would have gone to trial had he known about the text messages. *See United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002) ("[C]onclusory allegations do not satisfy *Strickland*'s prejudice component."). Ross's allegations do not meet § 2254's "heightened pleading requirements." *See McFarland v. Scott*, 512 U.S. 849, 856 (1994). Ross has not provided specific allegations suggesting that his claim of ineffective assistance has merit, much less that it is clearly stronger than the claims that postconviction counsel raised. If Ross raised this claim in a § 974.06 motion, the circuit court would deny it under *Escalona–Naranjo* and *Romero-Georgana*. These state procedural bars are independent and adequate. *Eckstein*, 38 F.4th at 588–89; *Whyte v. Winkleski*, 34 F.4th 617, 624–25 (7th Cir. 2022); *Garcia*, 28 F.4th at 767, 774–75. In any case, Ross's claim of ineffective assistance is plainly deficient.

Even though Ross's claim of ineffective assistance is plainly deficient, I will consider whether he could overcome procedural default by showing in federal court "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. Whether cause exists generally turns on whether the factual or legal basis for

14

the claim "was not reasonably available to counsel," or whether "some interference by officials" made it "impracticable" for counsel to comply with the state procedural rule. *See Moore v. Casperson*, 345 F.3d 474, 486 (7th Cir. 2003). Ineffective assistance of counsel may "constitute cause to set aside a procedural bar." *Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010).

Ross bases his claim of ineffective assistance on the contention that its factual basis (the text messages) was available to postconviction counsel. Ross does not allege that an official stopped postconviction counsel from complying with *Escalona–Naranjo* and *Romero-Georgana*. Ineffective assistance of counsel may constitute cause to overcome procedural default but, again, Ross's ineffective assistance claim is plainly insufficient. This exception to the procedural default bar does not apply.

There is yet one more avenue to consider. As discussed, the Supreme Court has yet to hold that a prisoner may be entitled to habeas relief based on a standalone actual innocence claim in a non-capital case. But I may excuse Ross's procedural default if he "make[s] a credible claim, supported by new, reliable evidence of his innocence." *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009). Ross "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). So, even if Karen's recantation did not support a freestanding actual innocence claim, perhaps it would be enough to get past the procedural default bar.

Unfortunately for Ross, Karen's recantation is not credible or reliable. Some of Karen's statements make little sense. It is not fully apparent why Sarah would start crying and accuse Widder of assaulting her in the parking lot just because the boys angered her father by throwing a microwave down the stairs. It is even less apparent why Karen would start crying and accuse Ross of molesting Karen to support Sarah's accusation that Widder assaulted Sarah in the

15

parking lot: Sarah accused Widder, not Ross, of assault. It's also unclear how Karen's accusation that Ross assaulted Karen in the parking lot was necessary to support Sarah's accusation that Ross assaulted Sarah in the hallway. Karen's contentions that Sarah was crying merely because she was afraid of getting in trouble, and that Karen was crying because she was scared and confused, are not persuasive. *See Ross*, 2022 WI App 55, ¶ 17.

As the court of appeals determined, Karen's recantation does not explain: why Karen entered Sarah's apartment and left Sarah in the hallway with the boys; why Karen was standing on one side of the door listening to what was going on in the hallway; how the apartment door became cracked; or why any of the three males would throw the microwave down the stairs. *See id.* Karen alleges that the boys were persistent about getting in the apartment, but does not explain why they were persistent or why they would damage property. Furthermore, Karen's assertion that "she lied to protect Sarah because Sarah was her best friend was undermined by the fact that Karen and Sarah did not have any further contact once Sarah moved away." *Ross*, 2022 WI App 55, ¶ 17.

The fact that Karen made her recantation "[n]early five years after the incident" also weakens its reliability. *See id.* ¶ 6. This "substantial delay" raises doubts about the accuracy of Karen's memory and her credibility. *Cf. Blackmon v. Williams*, 823 F.3d 1088, 1102 (7th Cir. 2016). Also, Sarah and her sister did not recant their statements. *Ross*, 2022 WI App 55, ¶ 18. Karen's unsupported and dubious allegations don't provide a basis to credit her recantation over these "competing eyewitness accounts." *See Wilson*, 2023 WL 3766252, at *10–11.

Ross contends that Karen's text messages corroborate her recantation. The second text message is consistent with Karen's new statement that Ross did not take her shirt before the incident. But, as noted, the state court of appeals found that Ross stated that the group had

16

met in the parking lot to trade shirts, and Sarah did not recant her same statement. *Ross*, 2022 WI App 55, ¶ 18. In any case, the alleged fact that Ross did not take Karen's shirt does not show that Ross is actually innocent. Similarly, Karen's second text message is immaterial because Ross's innocence does not turn on the girls' alleged allegation that they were lured to the parking lot.

Karen's third text message allegedly stated: "Hurry I swear to god I'm gonna get raped." But, as explained above, it is unclear what this statement means. If it means that Karen planned to falsely accuse Ross of sexual assault or invited sexual contact, as Ross suggests, this statement would contradict Karen's recantation, not corroborate it. Even if Karen initially planned to accuse Ross of sexual assault or implied consent to sexual contact 1.5 hours before the incident, this does not mean that Ross is actually innocent of sexually assaulting her and Sarah later. The text messages do not support the credibility and reliability of Karen's recantation.

To sum up, Ross's actual innocence claim is not, on its own, cognizable under § 2254. Ross's claim of ineffective assistance is procedurally defaulted and, in any case, plainly insufficient. No evidentiary hearing is warranted because, as my analysis shows, "the record . . . precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). I have resolved the issues raised in the petition "by reference to the state court record." *Id.*

### C. Certificate of appealability

Because Ross seeks relief under § 2254, he may appeal this order only if he obtains a certificate of appealability. I may issue a certificate of appealability only if Ross makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability on his procedurally defaulted claim, Ross must demonstrate that reasonable jurists would debate whether my procedural ruling is correct and whether the

petition states a valid claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). To obtain a certificate of appealability on his actual innocence claim, Ross "must demonstrate that reasonable jurists would find [my] assessment of the constitutional claims debatable or wrong." *Id.* at 484. Because Ross cannot make these showings, I deny a certificate of appealability. Ross may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

ORDER

IT IS ORDERED that:

1. Petitioner's habeas petition, Dkt. 1, is DENIED, and a certificate of appealability is DENIED.

2. The clerk of court is directed to enter judgment and send petitioner copies of this order and the judgment.

Entered June 28, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge